Erik A. Christiansen, USB No. 7372
Andrew J. Somers, USB No. 19078
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 536-6719
Facsimile: (801) 536-6111
EChristiansen@parsonsbehle.com
ASomers@parsonsbehle.com

*Attorneys for Plaintiffs Landon Hart and Dallin Hart*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LANDON HART, an individual, and DALLIN HART, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> KOLE BRIMHALL, an individual; BRENNOR DOWNS, an individual; ATYPICAL WEALTH GROUP LP, a Delaware limited partnership; and ATYPICAL WEALTH PARTNERS LLC, a Delaware limited liability company, <br><br> Defendants. | **COMPLAINT** <br> Case No. 2:26-cv-711 <br> Judge: Hon. _____ |

Plaintiffs Landon Hart ("**Landon**") and Dallin Hart ("**Dallin**"), in their individual capacities (collectively, "**Plaintiffs**" of the "**Hart brothers**"), by and through undersigned counsel, hereby complain and allege as follows against Kole Brimhall ("**Brimhall**"), Brennor Downs ("**Downs**"), Atypical Wealth Group LP ("**AWG**"), and Atypical Wealth Partners LLC ("**AWP**").

4906-9139-9860.v6

## I.   PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Landon Hart is an individual residing in Orem, Utah County, Utah. Landon is a Limited Partner in AWG, holding 4 Units of Limited Partnership Interest therein.

2. Plaintiff Dallin Hart is an individual residing in Vineyard, Utah County, Utah. Dallin is a Limited Partner in AWG, holding 4 Units of Limited Partnership Interest therein.

3. Defendant Kole Brimhall ("**Brimhall**") is an individual residing in Utah County, Utah. Brimhall is a Manager and General Partner of AWP and an Initial Limited Partner of AWG. On information and belief, Brimhall was found guilty of fraud in the Offer and Sale of Securities, a federal felony pursuant to 15 U.S.C. § 77q(a), on May 5, 2025, in relation to an interstate securities fraud scheme.

4. Defendant Brennor Downs ("**Downs**") is an individual residing in Utah County, Utah. Downs is a Manager and General Partner of AWP and an Initial Limited Partner of AWG, and a co-conspirator of Brimhall.

5. Defendant Atypical Wealth Group LP ("**AWG**" or the "**Fund**") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in Orem, Utah, and a co-conspirator of Brimhall.

6. Defendant Atypical Wealth Partners LLC ("**AWP**") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Orem, Utah, and a co-conspirator of Brimhall. AWP is a special purpose entity controlled and managed by Brimhall and Downs. AWP is the General Partner of AWG.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action involves a federal question under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*.

4906-9139-9860.v6

8.      The Court further has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because certain additional claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

9.      Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391 because all Defendants are subject to personal jurisdiction in, and a substantial part of the events concerned occurred in, Utah County, Utah.

## II.      **GENERAL ALLEGATIONS**

10.      Defendants Brimhall and Downs, acting individually and in their respective capacities as Managers and General Partners in AWP, the General Partner of AWG, have solicited securities investments in AWG since at least June 9, 2023, when AWG issued a Confidential Private Placement Memorandum (the "**AWG PPM**").

11.      As set forth in the AWG PPM, AWG is a private investment partnership formed by Brimhall and Downs offering securities intended to generate profits for investors through the efforts of Brimhall and Downs for the purchase of one or more new or used trucks capable of hauling liquid hydrocarbons and other petroleum products to and from petroleum refineries and other distribution hubs.

12.      The securities investment is structured such that AWG holds title in the trucks, then leases the trucks to experienced third-party trucking company operators.

13.      AWG represents in the AWG PPM that it will derive cash flow from this leasing activity and use of the trucks, and then AWG will distribute quarterly payouts of realized net profits to investors in AWG.

14.      AWG planned to offer up to 1,000 Units of Limited Partnership Interest ("**Units**") at $50,000 per Unit.

4906-9139-9860.v6

15.    Purchasers of Units in AWG are referred to as "Limited Partners," and their engagement with AWG is governed by the AWG Limited Partnership Agreement, among other things.

16.    Limited Partners in AWG have the right and obligation to share in a proportional part of AWG's distributions, revenue, income, expenses, as well as Assets and liabilities—less transaction costs, operational expenses, and other costs associated with AWG's business—in accordance with the AWG Limited Partnership Agreement.

17.    Pursuant to Section 3.3 of the AWG Limited Partnership Agreement, the General Partner, AWP, represented that it intended to invest and reinvest the Fund's available capital, revenues and profits into Asset(s) and commence making quarterly distributions of any realized profits within 30 days after the end of the calendar quarter with a performance fee split of 70% to Limited Partners and 30% to the General Partner.

18.    The AWG Limited Partnership Agreement gives Limited Partners no right to withdraw from the Fund prior to either the dissolution and winding up of the Fund, unless the Limited Partner has held its Units for at least five years from the date the Limited Partner was admitted to the Partnership and, with 60-days prior written notice delivered to the General Partner, is granted the General Partner's written consent to withdraw.

19.    On June 4, 2023, Downs first approached Dallin to solicit potential investments from Dallin and his brother Landon in AWG, stating initially that investors in the Fund would earn between "6-10% monthly returns."

20.    Downs had previously approached Dallin to raise capital for multiple different investment opportunities in which Dallin had declined to invest, including a pickup truck resale

scheme in August 2021; a cryptocurrency investment scheme in January 2022; and, throughout 2022, a trucking and logistics investment and a bridge loan opportunity.

21.     Dallin's hesitation and ultimate unwillingness to invest in opportunities presented by Downs derived in part from the unrealistically high annual returns Downs promised: ranging from 20-120% for the cryptocurrency investment scheme and ranging from 25-28% for the trucking and logistics opportunity.

22.     Though Dallin did not immediately show interest in the AWG opportunity, Downs repeatedly reached out to Dallin regarding a potential investment in the AWG opportunity, including on June 5, 2023; June 8, 2023; August 31, 2023; September 26, 2023; October 3, 2023; November 6, 2023; December 27, 2023; and December 28, 2023.

23.     In seeking investment from the Hart brothers, Downs represented that the Hart brothers would get a return on their investment of 4-5% through distribution payments, while also providing documentation showing higher rates of return.

24.     For example, in a text message to Dallin on December 27, 2023, Downs sent a pro forma document for the Fund showing projected monthly returns exceeding 10%; Downs simultaneously explained that, despite higher numbers quoted therein, "4-5% a month right now is what people should realistically expect" for monthly returns.

25.     In that same conversation, Downs stated that "[a]ll expenses in the pro forma are accurate" and that "the revenue is slightly higher than it currently is in the market because January-April showed higher revenue."

26.     Downs also made numerous representations, on December 28, 2023, regarding the health of the underlying business, indicating that the third-party entities that would be operating

4906-9139-9860.v6

the Fund-held trucks have "each been operating for 15+ years and have contracts from some really big companies (Halliburton, Landstar, Exxon, Baker Hughes)."

27.    The Hart brothers were skeptical of Downs' representations because a friend of theirs, Eric Campbell, had had prior experience with Downs whereby Downs had misused funds Campbell had invested in a truck resale opportunity, purchasing trucks on Campbell's behalf when Campbell had requested that Downs not do so, and had declined to return Campbell's investment when Campbell requested it pursuant to the investment agreement there governing.

28.    On a phone call with the Hart brothers on or around December 28, 2023, when the Hart brothers specifically raised concerns related to Mr. Campbell's experience, Downs directly reassured the Hart brothers that no one had ever lost money on an investment that Downs had sourced, structured, or controlled; that he vetted this and every investment opportunity before presenting it to potential investors; and that this particular trucking investment opportunity was performing well.

29.    Nonetheless, the Hart brothers again declined to invest in the Fund.

30.    Following ongoing pressure from Downs and ultimately influenced by Downs' above-listed repeated representations in response to their concerns, the Hart brothers finally agreed, on December 29, 2023, to execute Subscription Agreements, each subscribing $200,000 to AWG ($50,000 per unit for 4 units per brother) and thereby both becoming Limited Partners in AWG LP, with their securities investment being governed by the incorporated AWG Limited Partnership Agreement, among other documents.

31.    After executing the Subscription Agreements, each brother subsequently executed two additional addenda with AWG, all on December 29, 2023.

4906-9139-9860.v6

32.     The first set of initial addenda provided additional terms whereby the performance fee structure with respect to the Hart brothers would be modified to a split of 75% to the Hart brothers and 25% to the Fund; the management fee for the Limited Partnership would be waived for each brother for the duration of their participation in the partnership; and an NDA would be put in place whereby the Hart brothers agreed to keep confidential information related to the terms of the addendum.

33.     The second set of addenda stated that the commencement of distribution payouts would begin two months from December 29, 2023, in February 2024.

34.     On February 21, 2024, when neither of the Hart brothers had yet to receive any payment from the Fund, Landon sent a text message to Downs asking which day of February the Hart brothers could expect their first payment.

35.     On that same date, in response to Landon's inquiry, Downs confessed to Landon via text message that AWG did not expect to timely make its first payment to the Hart brothers and sought to explain that this had to do with the timing with which the Fund received payment for each month of production.

36.     Additionally, in the same text message thread, Downs proposed an arrangement whereby the Hart brothers would wait an additional two months for payouts, but would receive a 100% split for the first 2-3 months of those payouts, suggesting that paying the Hart brothers as early as March would "further dilute" the Fund "for the investors who put money in quite a bit sooner."

37.     Still on February 21, 2024, in a group text message between Dallin, Landon, and Downs, Dallin and Landon expressed concern that every prior conversation the Hart brothers had had with Downs indicated that the first payment to the Hart brothers could be paid in February,

while neither Downs nor any other representative of the Fund conveyed to the Hart brothers that the first payment would not be until March because of payment timelines from the trucking companies.

38.     Dallin repeatedly pointed out that the Hart brothers were simply seeking fulfillment of the contract by its own terms; that the deal between the Hart brothers and the Fund "was very specific that the first payment would come in February"; and further that the Hart brothers explicitly requested that February be listed in the contract as the date when they could first expect payment because Downs' prior vague explanations about the Fund's operations had concerned the Hart brothers, who had sought to reduce risk through inclusion of this term.

39.     Downs' response indicated that the Fund did not have the resources to make the promised February payments to the Hart brothers; pointed to issues with the third-party trucking companies; and reiterated Downs' offer that, if the Hart brothers were to wait for their first payment, the Fund would provide them a 100% split "for a few months."

40.     Dallin and Landon reiterated that the contract emphasized a February payment, and that they felt that, if Downs knew that payments were to be delayed due to the payment structure with the third-party trucking companies, that "would have been important information to tell us before hand when the expectation was set that we would be paid in February."

41.     In the same conversation, and despite the fact that Downs had already made clear the Fund's intention to breach its contract with the Hart brothers, Landon and Dallin sought in good faith to negotiate an alternative arrangement with the Fund whereby payment could start in May in exchange for the Hart brothers receiving a 100% split for the remainder of the year.

42.     On February 26, 2024, Downs indicated that his business partner, Brimhall, "would have a hard time doing 100%, especially for that long," and instead proposed an arrangement

whereby the Hart brothers would receive a delayed first payment, but with a performance fee structure split of 80% to the Hart brothers and 20% to the Fund for the life of the Fund, ultimately indicating that the first payment would be made by the Fund in May.

43.     Dallin responded that the Hart brothers were open to those terms only if the first payment were made in April as opposed to May; he additionally reiterated the previously agreed-upon term that, as part of the agreement, the Fund would transfer $500 to each Hart brother to pay for "swag."

44.     No agreement was reached in this conversation regarding mutually agreeable terms.

45.     On February 29, 2024, Downs misquoted the Hart brothers' previous statements and again insisted that payments could not be made to the Hart brothers until May, and that they would receive the performance fee structure split of 80% to the Hart brothers and 20% to the Fund.

46.     In that same conversation, Landon responded, clarifying that the Hart brothers were only open to payment beginning in May if they received a 100% fee split for the remainder of 2024, while they were open to the 80%/20% terms only if payments began in April, and stating that "[t]his is starting to feel very unprofessional and weird."

47.     Landon then stated that "[w]e will stick to the original agreement then, and expect payment by the end of the day today."

48.     Downs became accusatory in response, and indicated that "we've already done way more for you than any other investors," before ultimately offering terms of a 100% split in May, followed by an 80%/20% split for the life of the Fund, presumably premised on payments beginning in May.

49.     The Hart brothers agreed to this arrangement and requested provision of a new addendum including all updated details.

4906-9139-9860.v6

50.     Prior to sending any discussed addendum for the Hart brothers to sign, Downs reassured the Hart brothers, repeating the representations he had made immediately prior to the Hart brothers investing in the Fund: "[n]o one's ever lost money in a deal I've done/structured though and I take a lot of time vetting it out and making sure it works for people.  Just trying to look out for everyone involved."

51.     Downs provided the addendum to the Hart brothers on February 29, 2024, for each of their individual signatures, which updated the performance fee structure with respect to the Hart brothers to a split of 80% to the Hart brothers and 20% to the Fund, stating that the Hart brothers would receive first payouts in May 2024, and stating that the Hart brothers would receive 100% of the split for the month of May prior to reversion to the 80-20 fee structure split thereafter.

52.     The Hart brothers did not initially execute the addenda because Downs had failed to include the $500 term for payment to the Hart brothers for "swag."

53.     When Downs provided the correct version of the addenda, the Hart brothers each signed this addenda on or about May 7, 2024, formally updating the terms of their engagement with the Fund.

54.     Despite Downs' prior assertions that payment to the Hart brothers in March or April was untenable, in an email to all investors in the Fund on March 18, 2024, Downs and Brimhall stated that "we saw an increase in production from individual trucks this month over the previous month" and that "[w]e expect to have several more trucks on the road and producing over the following 2 months which will reflect in the overall payout amounts."

55.     In another update to investors on April 17, 2024, Downs and Brimhall stated that "[o]ver the next few months of payouts, investors will see an increase on returns as more trucks hit the road.  The busy time of year is also rolling in which will increase revenue numbers as well."

4906-9139-9860.v6

56.     In both update emails, Downs and Brimhall provided vague but generally optimistic details about the movement of Fund-held trucks between third-party companies.

57.     The Hart brothers had the impression, from the emails, that potential operational concerns were being handled by the Fund and that there was no reason to believe that returns would be significantly lower than promised and expected rates.

58.     Neither Dallin nor Landon received a payment in May, 2024, as promised in the addenda executed by the Hart brothers on or about May 7, 2024.

59.     Dallin and Landon received their first payments from AWG on June 5, 2024, in the amount of $4,212.10 each.  This represented a 2.1% return rate on the brothers' initial investment.

60.     Dallin and Landon received their second payments from AWG on July 9, 2024, in the amount of $3,009.84 each.  This represented a 1.5% return rate on the brothers' initial investment.

61.     On July 10, 2024, in a group text message between Downs and the Hart brothers, the Hart brothers expressed concern regarding the low returns they were seeing and that, having been investors in the firm for 6 months, they were expecting a 5% return as promised.

62.     On that same date, Downs replied that there had been setbacks and larger expenses associated with the business and stated that a realistic expectation for returns long term would be 3-3.5%, but that "the payouts will definitely increase from here."

63.     The Hart brothers expressed further concern, with Dallin stating that "[t]his changes the investment significantly."

64.     In the midst of ongoing conversation between the Hart brothers and Downs regarding concerns about returns, Downs, on July 29, 2024, sought to recruit the Hart brothers as investors in yet another deal called "HotelShift" that he claimed was "as good of a deal in the

multifamily space as I've seen." The Hart brothers did not respond to Downs regarding this opportunity.

65.    Despite prior assurances from Downs about the likelihood that payouts would increase, Dallin and Landon saw a return rate of only 1.6% on the Fund's third payments made to the Hart brothers on August 12, 2024, in the amount of $3,156.73 each.

66.    Dallin and Landon received their fourth payments from AWG on September 3, 2024, in the amount of $3,453.09 each. This represented a 1.7% return rate on the brothers' initial investment.

67.    Dallin and Landon received their fifth payments from AWG on October 23, 2024, in the amount of $3,799.40 each. This represented a 1.9% return rate on the brothers' initial investment.

68.    Neither Dallin nor Landon received an expected payment from AWG in November 2024.

69.    Dallin and Landon received their sixth payments from AWG on December 23, 2024, in the amount of $4,256.31 each. This represented a 2.1% return rate on the brothers' initial investment.

70.    Dallin and Landon received their seventh payments from AWG on January 17, 2025, in the amount of $2,538.65 each. This represented a 1.3% return rate on the brothers' initial investment.

71.    Neither Dallin nor Landon received an expected payment from AWG in February 2025.

72. Dallin and Landon received their eighth payments from AWG on March 19, 2025, in the amount of $2,216.80 each. This represented a 1.1% return rate on the brothers' initial investment.

73. Dallin and Landon received their ninth payments from AWG on April 16, 2025, in the amount of $2,792.83 each. This represented a 1.4% return rate on the brothers' initial investment.

74. Dallin and Landon received their tenth payments from AWG on May 23, 2025, in the amount of $2,941.49 each. This represented a 1.5% return rate on the brothers' initial investment.

75. On May 23, 2025, Landon, in a group text message with Dallin and Downs, expressed concern that the returns the Hart brothers were receiving were still consistently 1-2%; that these low levels of return would not even cover the depreciation of the vehicles owned by the Fund; and that these returns were less than half the expectation set by Downs and asked whether other investors had also not received February payments.

76. In that same group text message, Downs responded pointing to various issues with the third-party trucking operations companies, again promising that "production will increase."

77. Downs also stated that no investors in the Fund had received February payments, which he claimed was tied to low production, the cost of renewing truck registration, and truck maintenance in December.

78. Landon then stated that, given that the fund had not performed or generated results "even close to the expectation that was set," he wanted to discuss, with Downs, options for "exiting the fund asap *[sic]* before the trucks depreciate more."

4906-9139-9860.v6

79. Downs stated that, "[w]hen there are other investors that want to enter, I can explore the option of some type of buyout."

80. Per Landon's suggestion, Downs then participated in a phone call with the Hart brothers during which Downs indicated that he would work toward finding one or more replacement investor(s) to facilitate a buyout of the Hart brothers' shares.

81. On June 11, 2025, and June 25, 2025, the Hart brothers followed up on Downs' progress in replacing the Hart brothers as investors in the Fund, indicating that they had involved legal counsel.

82. Down stated in response, on June 25, 2025, that he had not "heard back from the investor that was looking into the fund"; he further reiterated to the Hart brothers his position that "there was no 'verbal commitment' of returns," that "[t]here was never a commitment or guarantee of any returns, as stated in the deck, pro formas, and PPM that was signed by all sides," and finally stated that "if you want to bring in a lawyer, you can have him talk to the fund's attorney."

83. Still having received no word on the potential for a substitute investor, the Hart brothers informed Downs, still on June 25, 2025, of their intention to involve counsel but their preference for resolving issues with Downs directly, advising Downs of the Hart brothers' position that "[a] lot has changed since [the Hart brothers' initial investment in the Fund]: your original partner is no longer involved, and the groups you've invested with have shifted as well."

84. Downs did not respond to this message.

85. Downs' original partner and Defendant in this case, Kole Brimhall, was no longer involved because he had been sentenced, on May 6, 2025, to 12 months and one day imprisonment for defrauding investors in the amount of approximately $20 million.

86. The Hart brothers reached out to Downs again on July 14, 2025, expressing concern that they had not been paid in either June or February.

87. Downs replied that "there wasn't a payment for anyone," indicating that this was due to costs related to the trucks and issues with the third-party trucking companies.

88. The Hart brothers had never been warned, in discussions with Downs, of the apparent high potential for regular non-payment from the Fund to investors where payments would otherwise be reasonably expected.

89. Dallin and Landon received their eleventh payments from AWG on July 15, 2025, in the amount of $3,025.57 each. This represented a 1.5% return rate on the brothers' initial investment.

90. Landon followed up with Downs again via text message on August 7, 2025, to inquire regarding progress on replacing the Hart brothers with another investor in the Fund.

91. When Downs did not respond to this message, Dallin followed up on the same text thread on August 13, 2025, again seeking an update and stating that "[t]he expectation set was too far from the reality of the situation provided."

92. Downs responded that he "spoke to the fund attorney about the idea of a buyout from a new investor, and unfortunately, a buyout isn't possible because the original investment included tax benefits from depreciation. Those depreciation benefits have already been taken and allocated to the existing investors, meaning a new investor wouldn't be able to receive that same benefit. Our PPM doesn't allow for swapping investors after the depreciation has been taken."

93. This was the first time that Downs represented that the Hart brothers could not be replaced in the Fund, despite the fact that Downs had begun making representations that a buyout was possible in May 2025.

4906-9139-9860.v6

94. Landon responded that, given the situation described by Downs, "[w]e need to sell the trucks now then to liquidate," and that "[i]f we can't be replaced in the fund we [100%] need to divest and sell those assets to get out of this. I can meet anytime Friday."

95. Dallin additionally pointed out that "when we bought in it was very clear that we were buying specific trucks."

96. Downs responded on August 14, 2025, indicating that "it's up to the [third party trucking companies] if they will release [the trucks] because they are leased to them for a set time period."

97. Landon followed up asking why the payment platform they had previously been using, Gusto, was no longer working.

98. Downs replied that the investor portal had been updated to a new platform, Homebase, and that the Hart brothers should create logins to track their investments.

99. When asked when the platform had changed, Downs indicated that it had changed "[a] couple months ago" and had apparently only provided notice of this via general investor email updates.

100. Landon followed up with numerous questions regarding changes to the name of the Fund (apparently now doing business as "Cargo Capital") and the new payment processing software, indicating that he did not feel adequately informed of these updates.

101. Landon also began questioning the underlying third-party trucking companies that the Fund was utilizing, indicating that he understood that the original investment projections were based off the use of one particular company, RW Logistics and Transport ("RW"), based in Texas, but that it seemed that that company was no longer being used.

4906-9139-9860.v6

102. Downs then sought to blame RW for short comings, stating that "[w]e don't believe their numbers were accurate/honest seeing that once our trucks started running, they were nowhere near those numbers," and further added that a reference for another trucking company Downs had spoken to had indicated to Downs previously that, when this reference had invested in RW, RW had shown similar negative performance.

103. Landon replied that it is "hard to have confidence when the first text you sent to Dallin—your fourth time in just a few years soliciting us for a different investment fund or opportunity—was pitching a 6-10% monthly return.  Now you're saying that company wasn't giving you accurate or honest numbers.  On top of that, the only other company you used to send trucks had already told you and [Brimhall]—before we invested—that they were unreliable and had the same issues.  It feels like there wasn't enough due diligence and the [F]und wasn't represented in the right fiduciary way."

104. Downs sought to clarify that conversations regarding RW's negative performance had occurred later, and that he was unable to explain why the trucking numbers were bad.

105. Landon also inquired about the status of Brimhall's investment in the Fund, given that Brimhall was now in prison for federal securities fraud, asking why other investors' equity had not gone up.

106. Rather than responding to this inquiry directly, Downs responded to the Hart brothers providing previously unmentioned information about the performance fee split for investors, stating that "[e]veryone is getting 85% split now.  It was originally 70/30 in Atypical. Your deal was 75/25 I believe, so you're up to 85 now."

107. Landon responded that "the contract was broken after the first two months when you missed the first payment, even though you were contractually obligated to make it.  I think we

need to figure out a way for us to get our money back, and for you to recapture some depreciation if that's necessary."

108. Neither Dallin nor Landon received an expected payment from AWG in August 2025.

109. Dallin and Landon received their twelfth payments from AWG on September 19, 2025, in the amount of $3,216.04 each. This represented a 1.6% return rate on the brothers' initial investment.

110. Neither Dallin nor Landon have received any payments from the Fund since the twelfth payment in September, 2025.

111. Downs has not responded to any communications from the Hart brothers since fall of 2025.

112. Dallin and Landon have not entered into any agreement formally exiting the Fund and are therefore technically still investors therein.

113. Before and throughout the course of the Hart brothers' investment, Downs and Brimhall have failed to disclose to the Hart brothers, in a timely or transparent fashion, the health of the business underlying the Fund and the Fund's true financial picture, although Downs and Brimhall were obligated to do so.

114. Throughout the course of the Hart brothers' investment, when faced with the Hart brothers' legitimate concerns that the Fund had breached contractual and other promises upon which the brothers had relied in making and maintaining their investment, Downs, Brimhall, and the Fund continually reassured the Hart brothers with additional false promises.

115. The Hart brothers have lost significant investment opportunities as a result of their coerced participation in the Fund.

**FIRST CLAIM FOR RELIEF**
(Federal Securities Fraud Under 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)

116.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

117.    Pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("**Securities Exchange Act**"), 15 U.S.C. § 78j, it is "unlawful for any person, directly or indirectly… to use or employ, in connection with the purchase or sale of any security… any manipulative or deceptive device or contrivance in contravention of such rules and regulations [of the Securities and Exchange Commission ("**SEC**")].."

118.    SEC Rule 10b-5 states, in turn, that it is unlawful, "in connection with the purchase or sale of any security," for a person "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.

119.    Defendants sold "securities" under the Securities Exchange Act to investors including Plaintiffs.

120.    Defendants made specific representations in relation to the sale of those securities to Plaintiffs, including stating that Plaintiffs would "realistically expect" a return on their investment of 4-5% through distribution payments; that Plaintiffs could expect a first payout within two months of investing in Defendant's Fund; that Defendants would be purchasing specific trucks and operating them in a profitable manner; and, repeatedly, that investment returns were expected to increase over time.

4906-9139-9860.v6

121.    Defendants knew or should have known that the foregoing promises were false when made, and that the Fund did not have the liquidity or rate of return necessary to fulfill the financial promises made to Plaintiffs.

122.    Further, Defendants knew or should have known that the purchase of trucks to be leased to third parties for the transfer of petrochemical products would not generate the profits necessary for the Fund to meet the promised rates of return.

123.    Defendants' fraudulent securities scheme was intended to enrich Defendants at the expense of investors, including Plaintiffs, or at the very least, was recklessly indifferent to the risk that Plaintiffs would not receive return on their investments.

124.    Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

125.    Plaintiffs actually and reasonably relied on Defendants' false representations when deciding to invest in AWG and specifically purchased Units of the Fund, as opposed to using their capital to invest in any other opportunities, because of Defendants' representations regarding rates of return and timing of payments.

126.    Plaintiffs have lost their ability to invest in other opportunities while not receiving return on investment from the AWG scheme.

127.    Plaintiffs have further lost their money and their ability to invest in other opportunities because Defendants refuse to permit any buyback of Plaintiffs' Units of the Fund.

128.    By engaging in the conduct described above, Defendants, in connection with the purchase and sale of securities, directly and indirectly used and employed devices, schemes, and artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they

4906-9139-9860.v6

were made, not misleading; and engaged in acts, practices, or courses of business which would operate as a fraud or deceit upon any person, and indeed operated as such upon Plaintiffs.

129.    By reason of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(b).

130.    As a result of such violations, Plaintiffs have been damaged in an amount to be proven at trial, but in no case less than the Hart brothers' total investment amount of $400,000.00.

**SECOND CLAIM FOR RELIEF**
(State Law Securities Fraud Under Utah Code § 61-1-1)

131.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

132.    Pursuant to Utah Code § 61-1-1, "[i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to: (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

133.    Plaintiffs purchased securities, in the form of Units in AWG's limited partnership, from AWG.

134.    In connection with the sale of those securities to Plaintiffs and Plaintiffs' ongoing ownership of the same, Defendants employed devices, schemes, and artifice to defraud, including by misrepresenting the investment arrangement offered and projected returns, including as set forth herein.

135.    Specifically, Defendants represented to Plaintiffs in writing that Plaintiffs would "realistically expect" a return on their investment of 4-5% through distribution payments.

136.    Defendants additionally represented to Plaintiffs that payments would begin within two months of Plaintiff's investment.

137.    Defendants additionally represented that the Fund would operate through the purchase of specific vehicles, which would be operated by experienced third-party operators holding contracts with major entities.

138.    In connection with the sale of those securities to Plaintiffs and Plaintiffs' ongoing ownership of the same, Defendants made untrue statements of material facts and omitted statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by misrepresenting the state of AWG's business prior to and throughout the Hart brothers' investment.

139.    In connection with the sale of those securities to Plaintiffs and Plaintiffs' ongoing ownership of the same, Defendants engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person.

140.    Plaintiffs actually and reasonably relied on the false representations set forth herein.

141.    By engaging in the conduct described above, Defendants violated Utah Code § 61-1-1.

142.    As a result, Plaintiffs have been damaged in an amount to be proven at trial, but in no case less than the Hart brothers' total investment amount of $400,000.00.

## THIRD CLAIM FOR RELIEF
(Fraudulent Misrepresentation)

143.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

144.    Defendants made the above financial representations to Plaintiffs regarding the Fund knowing them to be false, or with reckless disregard as to their truth or falsity.

4906-9139-9860.v6

145.    Specifically, Defendants either knowingly or recklessly: (a) misrepresented the projected returns on investments in the Fund; (b) misrepresented the nature, amount, and status of Defendants' investments, debts, liabilities, and financial challenges; (c) misrepresented the health of the business operations underlying the Defendant Fund; and (d) misrepresented the Plaintiff's purported ability to exit the Defendant Fund.

146.    These representations were made with the intent to induce Plaintiffs to: (a) enter into Subscription Agreements and thereby invest in the Fund; and (b) enter into subsequent business arrangements with the Fund having negative impacts to Plaintiffs.

147.    Plaintiffs did not know the representations were false and had no reasonable means of discovering their falsity, as Defendants controlled all financial information and accounts of AWG and withheld transparent access thereto from Plaintiffs.

148.    Plaintiffs reasonably and justifiably relied on Defendants' financial representations, and such reliance was a direct and proximate cause of Plaintiff's damages.

149.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial but in no case less than the Hart brothers' total investment amount of $400,000.00.

150.    Because Defendants' conduct was intentional, knowing, fraudulent, and/or manifested a knowing and reckless indifference toward the rights of Plaintiffs, Plaintiffs are entitled to an award of punitive damages pursuant to Utah Code Ann. § 78B-8-201.

## FOURTH CLAIM FOR RELIEF
(Negligent Misrepresentation)

151.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

152.    In inducing Plaintiffs to enter into Subscription Agreements with the Fund, and in inducing Plaintiffs to enter into subsequent business arrangements with the Fund injurious to Plaintiffs and advantageous to the Fund, Defendants supplied Plaintiffs with false information, including financial representations regarding AWG's assets, liabilities, debt obligations, and projected financial returns.

153.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the financial representations.

154.    Specifically, Defendants either knew the financial representations were false, failed to verify their accuracy, or failed to disclose material information necessary to prevent the representations from being misleading.

155.    The representations were provided to Plaintiffs for the specific purpose of inducing Plaintiffs to enter into the Subscription Agreements and subsequent business arrangements.

156.    Plaintiffs justifiably and reasonably relied on the representations in deciding to enter into the Subscription Agreements and subsequent business arrangements.

157.    As a direct and proximate result of Plaintiffs' justifiable reliance on Defendants' negligent misrepresentation, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial but in no case less than the Hart brothers' total investment amount of $400,000.00.

## FIFTH CLAIM FOR RELIEF
(Civil Conspiracy)

158.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

4906-9139-9860.v6

159.    Defendants Brimhall and Downs were aware of the duties owed by AWG to its Limited Partners and other members, including the duty to undertake securities-related actions in a legal and ethical manner.

160.    Brimhall, in his role as a Manager and General Partner of AWP and an Initial Limited Partner of AWG, directly conspired with Downs, AWP, and AWG in the commission of federal and state securities fraud, fraudulent misrepresentation, and negligent misrepresentation.

161.    Downs, in his role as a Manager and General Partner of AWP and an Initial Limited Partner of AWG, directly conspired with Brimhall, AWP, and AWG in the commission of federal and state securities fraud, fraudulent misrepresentation, and negligent misrepresentation.

162.    Plaintiffs have been damaged as a result of Brimhall, Downs, AWP, and AWG's conspiracy to utilize the above fraudulent mechanisms and misrepresentations to obtain investments from investors, including Plaintiffs.

163.    As a result of Defendant's actions, Plaintiffs have been damaged in an amount to be proven at trial, but in no case less than the Hart brothers' total investment amount of $400,000.00.

**SIXTH CLAIM FOR RELIEF**
(Breach of Contract Regarding the AWG Limited Partnership Agreement)

164.    Plaintiffs incorporate and replead the foregoing paragraphs as if fully set forth herein.

165.    Plaintiffs performed all of their obligations under the AWG Limited Partnership Agreement.

166.    Both the AWG PPM and the AWG Limited Partnership Agreement indicated that AWP was to make "quarterly distributions of any realized profits [of AWG] within 30 days after the end of the calendar quarter," with 70% of such funds being allocated to AWG's Limited

Partners and 30% allocated to the General Partner, as amended by any addenda and related agreements entered into between AWG and Plaintiffs.

167. Plaintiffs have not received any distributions at all since September of 2025.

168. In addition, the AWG PPM indicates that pro rata portions of AWG's losses and deductions will "flow through" to each Limited Partner or owner of Units, with each Limited Partner able to deduct his or her distributive share of AWG's losses on their federal income tax return.

169. Plaintiffs have not received any communications reflecting AWG losses or other information that might allow them to deduct the losses attributable to their investment in AWG on their federal income tax returns since September of 2025.

170. Brimhall and Downs, both individually and by and through their roles as Managers and General Partners of AWP, which is General Partner of AWG, have failed to uphold the provisions of the AWG Limited Partnership Agreement.

171. The failure to allocate the appropriate portions of AWG's income, gains, losses, deductions, or credit to Plaintiffs since September of 2025 constitutes a breach of Section 3.3 of the AWG Limited Partnership Agreement.

172. Section 5.5(a) also requires the General Partner — AWP — to provide to any Limited Partner "true and full information regarding the status of the business and financial condition of [AWG]" upon reasonable demand of any Limited Partner.

173. By repeatedly providing false statements regarding the business and financial condition of AWG when such information was requested by Plaintiffs, AWP, Brimhall, and Downs have breached Section 5.5(a) of the AWG Limited Partnership Agreement.

4906-9139-9860.v6

174.    As a direct and proximate result of Defendants' breach, Plaintiffs have been damaged in an amount to be proven at trial, but in no case less than the Hart brothers' total investment amount of $400,000.00, together with any unallocated losses for tax purposes, distributions of gains, AWG income, deductions, credits, or other proceeds of the Hart brothers' total investment amount.

## III.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment against Defendants and award the following relief:

A. Rescission of the Subscription Agreements and all addenda and related agreements entered into between AWG and Dallin and Landon Hart, respectively, and a return of the consideration paid in connection therewith.

B. An award of damages in an amount to be determined at trial but in no case less than the Hart brothers' total investment amount of $400,000.00;

C. An award of costs and attorneys' fees to Plaintiffs to the extent permitted by law or contract;

D. Punitive damages as provided by Utah law;

E. Pre- and post-judgment interest at the rate provided by applicable Utah law on the above amounts until paid in full; and

F. Any other such relief as the Court deems just and equitable in these circumstances.

## IV.   **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a jury on all claims, causes of actions, defenses and issues properly triable before a jury.

4906-9139-9860.v6

DATED this 30th day of July, 2026.

/s/ Andrew J. Somers
ANDREW J. SOMERS
ERIK A. CHRISTIANSEN
PARSONS BEHLE & LATIMER

*Attorneys for Plaintiffs Landon Hart and Dallin Hart*

4906-9139-9860.v6